# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-01367-SCT

*GULF INSURANCE COMPANY*

*v.*

*NEEL-SCHAFFER, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2003 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | SHERYL BEY |
| | DOUGLAS A. MANGEL |
| | BRIAN A. COLEMAN |
| ATTORNEYS FOR APPELLEE: | ROY H. LIDDELL |
| | ROBERT JAMISON BAREFIELD, JR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 12/09/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE COBB, P.J., CARLSON AND RANDOLPH, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. Gulf Insurance Company ("Gulf") appeals from a chancery court order denying its Motion to Compel Arbitration filed against Neel-Schaffer, Inc. ("Neel-Schaffer"). The motion was based on an arbitration clause contained in the insurance contract between Gulf and Neel-Schaffer. From that same order, Gulf also appeals the chancellor's preliminary injunction which enjoined the then-pending arbitration proceedings in New York. Finding that the chancellor erred in denying the motion to compel arbitration, this Court reverses the judgment

entered by the Chancery Court of the First Judicial District of Hinds County and remands this case for further proceedings consistent with this opinion.

## FACTS AND PROCEEDINGS IN THE CHANCERY COURT

¶2.     Neel-Schaffer entered into an insurance contract with Gulf by which Gulf agreed to provide employment-related practices liability insurance ("EPLI") coverage for claims made against Neel-Schaffer and reported to Gulf during the period from August 1, 2000, to April 1, 2001.   This was the fourth consecutive EPLI contract between the two parties.   As in the prior three policies, Section VI of the Policy provided:

> We have no duty to provide coverage under this Policy unless there has been full compliance with all the Conditions contained in this Policy:
>
> A.      **Arbitration**.   Any controversy arising out of or relating to this Policy or its breach shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association.   The arbitration panel will consist of three (3) arbitrators.   One of the arbitrators will be chosen by **you** and one arbitrator will be chosen by **us**.   Those two arbitrators will then choose the third arbitrator.   Unless the parties otherwise agree, within thirty (30) days of the parties submitting their case and related documentation, the arbitration panel will issue a written decision resolving the controversy and stating the facts reviewed, conclusions reached, and the reasons for reaching those conclusions.   The arbitration panel may make an award of Compensatory "**Loss**", but may not award punitive or exemplary "**Loss**".   The decision of the arbitration will be final and binding on both parties in any court.   **You** will bear the expense of the arbitrator chosen by you.   **We** will bear the expense of the arbitrator chosen by **us**.   **You** and **we** will share equally the expense of the other arbitrator.   The arbitration panel will allocate any remaining costs of the arbitration proceeding.

(emphasis in original).

¶3.    In September 2000, one of Neel-Schaffer's female employees discovered a camera mounted underneath her desk, pointed chair-level.[1]    According to Neel-Schaffer's complaint, a company supervisor admitted to placing the camera under the desk but "strenuously denied" any improper motive.    Following an internal investigation, Neel-Schaffer decided to retain the supervisor, whereupon the female employee refused to work at Neel-Schaffer and alleged that she was constructively discharged as of October 26, 2000. Subsequently, this employee demanded $500,000 to settle her claims.

¶4.    On November 10, 2000, notice of this claim  was received by Gulf's agent, Rockwood Programs, Inc., from Neel-Schaffer's insurance agent, Pittman Insurance & Bonding, Inc., d/b/a Pittman, Seay & Turner (Pittman).  Responding on November 22, 2000, Gulf agreed to treat the settlement demand as a "claim" under the policy, and further agreed to engage counsel and defend that claim subject to reservation of rights under the policy.  Gulf also set forth several coverage defenses potentially applicable to the claim.

¶5.    The female employee filed a formal Charge of Discrimination against Neel-Schaffer with the Equal Employment Opportunity Commission (EEOC) on November 21, 2000. Shortly afterwards, the employee and Neel-Schaffer agreed to participate in private mediation.

¶6.    In anticipation of that mediation, and to avoid subsequent coverage litigation, Gulf and Neel-Schaffer attempted to negotiate an acceptable contribution agreement.  There is a dispute as to whether a contribution agreement was actually reached; however, since this dispute is

---

[1]Although the female employee is named in the record, we see no reason to reveal her name in this opinion.

irrelevant to our discussion of the issues before us, we will not discuss the facts surrounding the efforts to negotiate a contribution agreement.

¶7. On March 21, 2001, Neel-Schaffer and its employee reached an agreement to settle her claim for $215,000. Both Neel-Schaffer and Gulf dispute the nature of the settlement payment. Neel-Schaffer alleged that the money was "compensatory damages", that it paid it in full, and that it should receive full reimbursement from Gulf because the payment is covered under the Policy. In accordance with the arbitration provision, Gulf filed a Demand for Arbitration against Neel-Schaffer with the American Arbitration Association ("AAA") on May 30, 2001. The parties disagreed as to the appropriate locale for the arbitration. The Demand was filed in New York, and Neel-Schaffer moved to transfer the arbitration proceedings to Mississippi.[2] By letter dated October 12, 2001, the AAA determined that the arbitration should go forward in New York.

¶8. On October 22, 2001, Neel-Schaffer filed the instant Complaint for Declaratory Judgment and Injunctive and Other Relief in the Chancery Court of the First Judicial District of Hinds County, against Gulf as well as its insurance agent, Pittman, and Pittman's successors, Bancorpsouth Bank and Bancorpsouth Insurance Services, Inc. (collectively "Pittman"). Neel-Schaffer alleged that its claims fell outside the scope of the arbitration provision. Neel-Schaffer sought a chancery court declaration regarding coverage and the propriety of the

---

[2]At one point, Gulf argued to the trial court that by objecting to the locale Neel-Schaffer implicitly waived any objections to arbitration. However, while objecting to the locale, Neel-Schaffer specifically reserved all rights to object to arbitration. In fact, in a letter dated October 5, 2001, Neel-Schaffer, through counsel, requested that the arbitration proceedings be transferred to Jackson, Mississippi, or alternatively, to Nashville, Tennessee; however in the last paragraph of the two-page letter, we find this language in italics: *"In submitting this argument concerning locale, Neel-Schaffer hereby reserves, and does not waive, its objection to arbitrability of this dispute."*

4

arbitration provision as well as an order enjoining the AAA proceedings in New York. Neel-Schaffer further set forth four counts against Gulf, seeking, *inter alia*, $250,000 in compensatory damages and $10 million in punitive damages due to Gulf's alleged wrongful refusal to provide coverage for the settlement.[3]

¶9.     That same day, Neel-Schaffer applied for and received, ex parte, a temporary restraining order from the chancery court thus enjoining the arbitration. The chancellor set a hearing for October 30, 2001, on Neel-Schaffer's request for preliminary injunctive relief.[4]   On October 26, 2001, Gulf filed a Notice of Removal with the U.S. District Court for the Southern District of Mississippi, Jackson Division, as well as a notice with the chancery court; therefore, the scheduled October 30th chancery court hearing did not occur.   Thereafter, on February 1, 2002, the federal district court entered an order remanding this case back to state court.

¶10.    On October 18, 2002, Gulf filed a Motion to Compel Arbitration, requesting that Neel-Schaffer's claims be referred back to the then-stayed AAA arbitration and that the complaint be dismissed. Both parties filed several responses in support of their respective positions. The chancellor heard arguments on March 3, 2003. Since the issues raised by the parties were basically identical, the parties agreed that the chancery court's ruling on the motion to compel would also dispose of Neel-Schaffer's earlier motion for injunctive relief.

---

[3]The four claims: Negligence, Breach of Contract, Tortious Breach of Contract and Breach of Fiduciary Duty.  The Negligence count was also directed against Pittman, from which Neel-Schaffer seeks recovery of initial defense expenses incurred in the underlying lawsuit for the alleged failure to report timely the claim to Gulf.  Parenthetically, since the issue is not raised in this appeal, we will not address the propriety of this action being commenced in chancery court as opposed to circuit court.  As revealed in the transcript of the chancery court proceedings, the appellate briefs, and oral arguments before this Court, Neel-Schaffer fervently asserted that it was entitled to relief based on the chancery court's "broad equitable powers."

[4]The motion for a preliminary injunction was filed four days later on October 26, 2001.

5

¶11. By opinion and order on March 4, 2003, the chancery court denied Gulf's request to compel arbitration, and granted Neel-Schaffer's motion for preliminary injunction enjoining the arbitration proceedings. Subsequently, Gulf filed a Motion to Reconsider or, In the Alternative, to Clarify Ruling and Certify for Appeal. A revised Opinion and Order was rendered on May 23, 2003.

¶12. The chancery court granted Gulf's motion to certify its order as final for appeal purposes pursuant to Miss. R. Civ. P. 54(b), and Gulf thus filed its notice of appeal. In today's appeal, by asserting that the chancery court erred in denying its motion to compel arbitration, and by granting Neel-Schaffer's motion for a preliminary injunction, Gulf raises the following issues:

I. A valid and enforceable agreement to arbitrate exists between Gulf and Neel-Schaffer under the Federal Arbitration Act;
II. Neel-Schaffer's claims are encompassed by the arbitration agreement;
III. The punitive damages waiver is a remedy limitation, not a limitation on the scope of the parties' agreement to arbitrate;
IV. Even if the arbitration agreement is ambiguous as to its scope, the Federal Arbitration Act compels that arbitration be ordered; and,
V. Even if claims for punitive damages are not subject to mandatory arbitration, Neel-Schaffer's complaint is still arbitrable.

On the other hand, Neel-Schaffer states the issues as follows:

I. The arbitration provision contained in the policy is invalid, unenforceable, void as against public policy, and Gulf should be equitably estopped from relying on any agreement to arbitrate;
II. Even if the arbitration provision is found to be valid, Neel-Schaffer's claims against Gulf fall outside the scope of the arbitration agreement contained in the policy;
III. Punitive damage claims are also beyond the scope of the arbitration agreement;
IV. The arbitration provision contained in the policy is substantively unconscionable; and,

6

V.     Neel-Schaffer has not waived its right to object to arbitration.

We will restate the issues as they are discussed.

**ANALYSIS**

¶13.    We review de novo the trial court's grant or denial of a motion to compel arbitration. *East Ford, Inc. v. Taylor*, 826 So.2d 709, 713 (Miss. 2002) (citing *Webb v. Investacorp, Inc.*, 89 F.3d 252, 256 (5th Cir. 1996)).

¶14.    The chancellor's initial opinion and order of March 4, 2003, held that the arbitration provision was ambiguous based on the fact that claims involving punitive damages fell outside its scope. Citing an official opinion rendered by the Mississippi Attorney General and the Mississippi Department of Insurance policy, the chancery court held that the provision was contrary to state law.    The chancery court noted that the policy forms at issue were inadvertently approved by the Mississippi Department of Insurance and that Gulf should not be allowed to benefit from this error.

¶15.    Gulf filed a Motion to Reconsider or, in the Alternative, to Clarify Ruling and Certify for Appeal.    In this motion, Gulf discussed several potential errors with the ruling and cited a recent decision by the Fifth Circuit in *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702 (5th Cir. 2002).    The chancery court subsequently entered a second opinion in which it denied Gulf's motion but modified its original reasoning.    In its modified ruling, the chancery court held that there was a valid arbitration agreement, but that the language concerning punitive damages was ambiguous.    The chancery court reaffirmed that the claim for punitive damages fell outside the scope of the arbitration agreement.    This second opinion and order also cited

***Orr*** and discussed the McCarran-Ferguson Act, 15 U.S.C. § 1012(b).[5] The parties refer to both orders in their briefs.

¶16. In determining whether to grant a motion to compel arbitration under the Federal Arbitration Act, courts generally conduct a two-pronged inquiry. ***East Ford***, 826 So2d at 713. *See also* ***Sanderson Farms, Inc. v. Gatlin***, 848 So.2d 828, 841-42 (Miss. 2003) (Cobb, J., dissenting). The first prong involves a determination of whether the parties agreed to arbitrate the dispute in question. ***Gatlin***, 848 So.2d at 842. There are two considerations under this prong: whether there is a valid arbitration agreement and whether the parties' dispute is within the scope of the arbitration agreement. ***Id***. The second prong involves whether legal constraints external to the parties' agreement foreclose the arbitration of those claims. ***Id***.

¶17. The arguments on appeal raise two issues: whether the arbitration provision is unenforceable under state law or public policy; and, if enforceable, did Neel-Schaffer's claims fall outside the scope of the arbitration provision.

## I. WHETHER THE PARTIES AGREED TO ARBITRATE THE DISPUTE IN QUESTION.

### A. Whether the Arbitration Agreement is Valid and Enforceable.

¶18. The arguments regarding validity and enforceability of the arbitration provision revolve around the Mississippi Department of Insurance's ("MDI") inadvertent approval of the policy form at issue.[6] As noted, the initial order relied on the MDI's error as grounds for denying the

---

[5]This second opinion and order is silent as to whether it rescinds or supplants the first opinion and order which was entered.

[6]The parties use the terms valid and enforceable interchangeably. These terms are not synonymous. That said, it is not clear whether the following analysis regarding the MDI's inadvertent approval is not more properly considered under prong two (i.e., external legal constraints limiting the provisions' enforceability).

motion to compel. In the second order, the chancery court did not mention this error. Instead, it held that the arbitration provision was valid but ambiguous, and therefore the claim for punitive damages fell outside of its scope. This Court shall thus determine whether the arbitration provision is valid notwithstanding the MDI's inadvertent approval. However, before considering this issue, we must first address the dispute between the parties regarding the controlling law.

¶19. The error in question occurred on February 19, 1998, when the MDI approved the EPLI policy form at issue. At that time, it was MDI's policy not to approve policy forms that contained a mandatory arbitration provision. The form was approved despite this policy. Although the record is less than clear on this point, we proceed on the premise that the same form was resubmitted and approved annually until 2001. On August 24, 2001, Commissioner of Insurance George Dale sent a letter informing Gulf that the form was inadvertently approved and that the mandatory arbitration provision was against his and the MDI's policy. He also stated in this letter that he directed the MDI legal staff to initiate the formal disapproval procedure pursuant to Miss. Code Ann. § 83-2-11(2) (Rev. 1999).[7]

---

Nevertheless, because both parties address this issue under the validity consideration incorporated in the first prong, we shall also.

[7]Section 83-2-11 provides as follows:

(1) The commissioner shall disapprove a rate or policy form or endorsement if the commissioner finds that the rate is unjustified, or the policy form or endorsement:
      (a) Is in any respect in violation of or does not comply with this code; or
      (b) Contains or incorporates by reference any inconsistent, ambiguous or misleading clauses or exceptions and conditions which unreasonably or deceptively affect the risk purported to be assumed in the general coverage of the contract.
(2) *Disapproval procedure*:
      (a) Upon disapproval of a filing, the commissioner shall issue an order specifying the manner in which the filing fails to meet the requirements of this chapter. The filer shall be

¶20. The record before us does not reveal whether the formal disapproval procedure was actually initiated and if so, its outcome. Under § 83-2-11, the Commissioner is required to issue an order specifying the results of the formal disapproval proceedings. Because none is contained in the record and neither party refers to such order, we conclude that formal disapproval proceedings were never completed. Gulf claims that the MDI and it agreed that Gulf would modify future EPLI policies issued in Mississippi, effective December 2001. Gulf claims the agreement was that it would change policies "on a going-forward basis."[8] Additionally, Gulf notes that the policy at issue- coverage beginning August 1, 2000 to April 1, 2001- was not affected by this resolution.

---

given a hearing upon written request made within thirty (30) days after the disapproval order.

     *(b) If the commissioner disapproves a rate, policy form or endorsement currently in effect, the commissioner shall issue such an order only after a hearing held on not less than twenty (20) days written notice to the filing insurer or rating organization. The insurer or rating organization may waive the hearing. An order shall be issued within fifteen (15) days after the close of the hearing or within thirty (30) days after the filing of a waiver of hearing and shall specify in what respects the rates policy form or endorsement fail to meet the requirements of this chapter. The order shall also state when the further use of such policy form or endorsement or rate in contracts of insurance made thereafter shall be prohibited which shall be within a reasonable period of time, but not less than forty-five (45) days. The order may include a provision for premium adjustment for policies issued, renewed or nonrenewed after the effective date of such order.*

(3) Whenever an insurer has no legally effective rates as a result of the commissioner's disapproval of rates or other act, the commissioner on request of the insurer shall specify interim rates for the insurer that are sufficient to protect the interests of all parties and the commissioner may order that a specified portion of the premiums be placed in an escrow account approved by the commissioner. When new rates become legally effective, the commissioner shall order the escrowed funds or any overcharge in the interim rates to be distributed appropriately, except that refunds to policyholders that are de minimis shall not be required.

(emphasis added).

     [8]We interpret this to mean "prospectively."

¶21.     Contained in the record is an affidavit accompanied by exhibits, all of which are sworn to by Deputy Commissioner Lee Harrell.    In his affidavit, Deputy Harrell addressed the inadvertent approval.[9] The accompanying documents reveal that in "November/December 1998" the MDI expressed its position to Gulf regarding mandatory arbitration provisions in insurance policy forms.[10]     Neel-Schaffer advances several arguments based on the fact that after the November/December 1998 notice, Gulf continued to submit a form that contained provisions prohibited by MDI policy.

### 1.     Controlling Law: Federal Arbitration Act and the McCarran-Ferguson Act.

¶22.     The parties dispute whether the Federal Arbitration Act ("FAA") is controlling or whether, pursuant to the McCarran-Ferguson Act, state law "reverse-preempts" the FAA.[11] Gulf argues that the arbitration provision is enforceable under the FAA.    *See* Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*  Citing § 2 of the FAA, Gulf notes that a written arbitration provision in a contract evidencing a transaction affecting commerce shall be "valid, irrevocable, and enforceable," unless recognized grounds exist to revoke the contract.    Neel-Schaffer argues

---

[9]Deputy Harrell stated that the MDI disagreed with any construction of the provision that effectuates a waiver of punitive damages in direct actions by the insured against the insurer.

[10]Gulf argues that it acted at all times in good faith.  There is no indication that when MDI reiterated its position regarding a mandatory arbitration provision, it was in response to or related to the specific insurance policy form at issue.

[11]The federal cases have utilized the doctrine of "reverse-preemption."  See *Orr*, 294 F.3d at 708. In today's case, this simply means that the allegation is that the later-enacted McCarran-Ferguson Act preempted the earlier-enacted Federal Arbitration Act because of an alleged invalidation of Mississippi law if the FAA were applied. Stated differently, the issue here is whether existing Mississippi law "reverse-preempts" federal law.

11

that the arbitration provision is unenforceable based on the fact that it is contrary to "state law as enacted by the State of Mississippi through the Mississippi Department of Insurance."

¶23. We briefly discuss the McCarran-Ferguson Act. The primary intent of Congress in enacting McCarran-Ferguson was to ensure that the states would continue to have the ability to tax and regulate the business of insurance. *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 217-19, 99 S.Ct. 1067, 1076-77, 59 L.Ed.2d 261 (1979). The Act provides in relevant part:

> (a) State regulation. The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

> (b) Federal regulation. No Act of Congress shall be construed to invalidate, impair, or supersede *any law enacted by any State* for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance[.]...

15 U.S.C. § 1012 (emphasis added). Neel-Schaffer's argument requires that this Court find that the MDI policy is the legal equivalent to state law as discussed under the Act. The local federal district and circuit courts have rejected this arguments, and we do so as well.

¶24. In so holding, we note that Neel-Schaffer's argument is not altogether unreasonable. Neel-Schaffer argues that in instances where a legislative branch has delegated its authority to regulate to an administrative agency and where that agency is considered the final regulatory authority, the agency's regulations should be considered the legal equivalent to statutes. Nevertheless, Neel-Schaffer presents no compelling argument as to why this Court should not adopt the view held by the local federal courts. Further reasoning to reject Neel-Schaffer's

argument is the fact that the Act incorporates the term "enact." The use of this term seemingly denotes a *legislative* enterprise.[12]

¶25. In *American Heritage Life Ins., Co. v. Harmon*, 147 F. Supp. 2d 511 (N.D. Miss. 2001), Chief Judge Davidson discussed the appropriate application of the McCarran-Ferguson Act to arbitration cases:

> The McCarran-Ferguson Act is designed to clear the way for state laws regulating the business of insurance, by displacing any federal law that conflicts with such state laws. But McCarran-Ferguson applies only in the narrow range of cases involving state regulation of the insurance industry, [and] permits a state law to reverse preempt a federal statute only if: (I) the federal statute does not specifically relate to the "business of insurance;" (ii) the state law was enacted for the "purpose of regulating the business of insurance;" and (iii) the federal statute operates to "invalidate, impair, or supersede" the state law. *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir.1998).
>
> The Defendant's reverse preemption argument fails because the Defendant has failed to point to a single Mississippi state law that the FAA has purportedly invalidated, impaired, or superseded. Instead, the Defendant appears to argue that because Mississippi's Commissioner of Insurance is seemingly opposed to approving insurance policies that contain binding arbitration clauses, McCarran-Ferguson reverse preempts the FAA. The Fifth Circuit has made clear, however, that McCarran-Ferguson only permits state laws or statutes to reverse preempt federal statutes; informal policies of state officials may not do so. *Munich Am. Reinsurance Co.,* 141 F.3d at 590. As such, the Defendant's claim of reverse-preemption fails and the McCarran-Ferguson Insurance Regulation Act is inapplicable.

147 F. Supp. 2d at 515. *See also Group Life*, 440 U.S. at 210, 99 S.Ct. at 1073. (defining the "business of insurance" as considered in the McCarran-Ferguson Act). In the end, Judge Davidson held that the defendant's claims should be referred to arbitration. 147 F. Supp. 2d at 517.

---

[12]"Enact" is defined as follows: "To establish by law; to perform or effect; to decree. The common introductory formula in making statutory laws is, `*Be it enacted*.' See **Enacting clause**."Black's Law Dictionary (5th ed. 472).

¶26. Subsequent to Judge Davidson's decision in *Harmon*, the Fifth Circuit addressed this issue. In *Orr*, the Fifth Circuit affirmed the district court's decision to grant American Heritage's motion to compel arbitration. The appellate court found that the McCarran-Ferguson Act did not reverse-preempt the FAA and rejected the argument that an attorney general's opinion or administrative policy was the functional equivalent of a state statute relating to insurance. 294 F.3d at 708-09. "The Act bars application of the FAA to insurance contracts only in the context of a *state statute* evincing the same, not mere policy statements of state officials or administrative rule interpretations of governmental entities." *Id*. at 708 (emphasis within)(citations omitted). [13]

¶27. We today adopt the sound reasoning set out in *Harmon* and *Orr*. Accordingly, we hold that the McCarran-Ferguson Act is inapplicable in today's case and that the FAA is not reverse-preempted by the MDI's policy.

### 2. Effect of the Inadvertent Approval on the Validity or Enforceability of Policy

¶28. In the initial opinion and order of March 4, 2003, the chancery court based its decision to deny arbitration at least in part on an attorney general's opinion and the MDI's inadvertent approval of Gulf policy forms which mandated arbitration. The chancellor opined:

> The Court also notes that the Mississippi Attorney General has rendered an official opinion that "Mississippi law does not provide that punitive damages can be excluded from insurance policies." Furthermore, it is the policy of the Mississippi Insurance Department not to approve policy forms that mandate

---

[13]In *Orr*, the Fifth Circuit considered the MDI's authority to prohibit arbitration clauses in light of its ruling. *Id*. at 709. In doing so, it held that the Commissioner had no authority to prohibit arbitration clauses relating to insurance. *Id*. As a result, the MDI changed its policy and now allows arbitration provisions provided certain restrictions are met. It is unclear under what authority the MDI now believes it can impose restrictions beyond that which is provided by FAA and judicial precedent.

arbitration. The policy was inadvertently approved by the Mississippi Insurance Department. Gulf should not benefit by resubmitting a policy provision it has been previously informed was unacceptable but which was erroneously approved by the Mississippi Insurance Department.

Lee Harrell, a Deputy Commissioner of Insurance for the State of Mississippi, submitted an affidavit which is part of the record in this case. In this affidavit, Deputy Harrell stated, inter alia, that the MDI had in the past approved Gulf's submission of certain policy forms for a new program of employment related practices liability, and that these forms contained mandatory arbitration provisions. Deputy Harrell, in referring to a prior letter from Commissioner Dale, likewise stated in his affidavit:

[I]t had been the policy of the Department of Insurance – and Commissioner Dale's policy as Commissioner of Insurance – *not* to approve policy forms, policy applications and other documents that provide for mandatory arbitration. Commissioner Dale explained that the approval of Gulf Insurance Company's employment related practices liability form containing a mandatory arbitration provision was the result of "inadvertent oversight" and "it should not have occurred." (emphasis in the original).

As already noted, there is also in the record an attorney general's opinion written in response to Commissioner Dale's inquiry as to whether certain insurance policies, including employment-practices liability policies, could exclude coverage for punitive damages under Mississippi law, and if so, would the Commissioner of Insurance have statutory discretion to disapprove policy forms which excluded punitive damages from coverage. In sum, the attorney general's opinion concluded that the Commissioner of Insurance was "vested with sufficient [statutory] authority to set Department policy as to whether punitive damage exclusions are permissible." ***Orr*** involved an appeal from the United States District Court for

15

the Northern District of Mississippi. The *Orr* court addressed the effect of an attorney general's opinion or a state official's policy statement on the FAA.

> The [McCarran-Ferguson] Act bars application of the FAA to insurance contracts only in the context of a *state statute* evincing the same, not mere policy statements of state officials or administrative rule interpretations of governmental entities. *See Miller v. Nat'l Fidelity Life Ins. Co.*, 588 F.2d 185, 186-87 (5th Cir. 1979). The party seeking to avail itself of the Act must demonstrate that application of the FAA would invalidate, impair, or supersede a particular *state law* that regulates the business of insurance. *Id*. At 187. "The test under McCarran-Ferguson is not whether a state has enacted statutes regulating the business of insurance, but whether such state statutes will be invalidated, impaired, or superseded by the application of federal law." *Id.* Appellants fail to identify any statute that would be impaired, invalidated, or superseded by the application of the FAA. Instead, Appellants try to perpetrate a judicial end-run by asserting that an attorney general's opinion or insurance department's regulatory, administrative policy is the functional equivalent of a state law relating to insurance, thereby triggering the provisions of the Act. Appellants' arguments are without merit.
>
> First, "[o]pinions of the Mississippi Attorney General do not have the force of law...." *Frazier v. Lowndes County, Mississippi Bd. of Educ.*, 710 F.2d 1097, 1100 (5th Cir. 1983) (citing *Local Union No. 845, United Rubber, Cork, Linoleum and Plastic Workers of Am., Home Assoc. v. Lee County Bd. of Supervisors*, 369 So.2d 497, 498 (Miss. 1979)). Second, because no Mississippi statute addresses, much less prohibits or restricts, arbitration of credit insurance-related claims, disputes or controversies, the Commissioner of Insurance for the State of Mississippi (the "Commissioner") is without regulatory authority to prohibit arbitration clauses relating to insurance. (Emphasis in the original).

294 F.3d at 708-09.

¶29. It is abundantly clear that it was not the intent of McCarran-Ferguson to reverse-preempt the application of the FAA because it was in conflict with state insurance department policy and an attorney general's opinion. Stated differently, a state insurance department policy and an attorney general's opinion are not "state laws" which are being invalidated by the application of the FAA. Thus, the learned chancellor erred in relying on the "inadvertent

16

approval" theory espoused by Neel-Schaffer, and in finding that the Commissioner of Insurance and the Attorney General could disapprove insurance policy forms which included mandatory arbitration provisions.

¶30. Notwithstanding our foregoing discussion on the effect of a state department policy on the FAA, we again emphasize that the Mississippi Code provides a specific statutory mechanism for the Commissioner to disapprove a policy form currently in effect. *See* Miss. Code Ann. § 83-2-11. Even assuming arguendo that state department policy could reverse-preempt the FAA, which it cannot, it is of no moment in today's case because pursuant to the provisions of § 83-2-11, the policy form remained in effect until a hearing and order was entered disapproving the form. The Commissioner only indicated that he planned to initiate the disapproval process and that should such ever be done, it would not limit the enforceability of the form at that time but prohibit future use of the form.

¶31. However, the record is void of MDI's initiation of formal proceedings to reverse the inadvertent approval. The Legislature created a procedure in which the MDI could reverse approval of policy forms. In this instance, the MDI chose not to institute such proceedings. Thus until the conclusion of formal reversal proceedings, a policy form previously approved would remain valid and enforceable. Again, based on our finding that today's application of the FAA does not invalidate any state law, the fact that Neel-Schaffer alleges that the MDI policy form approval was *inadvertent* is of no moment.

¶32. Finally, Neel-Schaffer makes several arguments based upon principles of equity, estoppel and unconscionability. These are procedurally barred and without merit. As to

17

substantive unconscionability, this issue is procedurally barred based on the fact that it is raised for the first time during this appeal.[14]

¶33. Finally, Neel-Schaffer argues that Gulf should be equitably estopped from attempting to enforce an arbitration clause which it knew was contrary to MDI policy. The doctrine of equitable estoppel requires proof of a belief and reliance on some representation, a change of position as a result of the representation, and detriment or prejudice caused by the change of position. *Mound Bayou Sch. Dist. v. Cleveland Sch. Dist.*, 817 So.2d 578, 583 (Miss. 2002). Neel-Schaffer does not address what misrepresentation Gulf made directly to it or how it acted on such misrepresentation. Moreover, Neel-Schaffer fails to reveal to us how it was ultimately prejudiced. This argument is without merit.

¶34. For the foregoing reasons, we unhesitatingly find that the arbitration clause contained in Gulf's insurance contract with Neel-Schaffer was valid and enforceable.

### B. Whether the parties' dispute is within the scope of the arbitration agreement.

¶35. In its second opinion/order, the chancery court found that while there was a valid agreement between the parties to arbitrate, the punitive damage provision of the arbitration agreement was ambiguous, and that Neel-Schaffer's claim for punitive damages thus fell outside the scope of the provision. We find that the chancery court erred and that the arbitration provision is not ambiguous in its scope.

---

[14]Neel-Schaffer argues that the arbitration provision is substantively unconscionable based on the fact that it waives its right to seek punitive damages.

¶36. The first sentence of the arbitration clause explicitly defines its scope.[15] The specific part of the arbitration clause found to be ambiguous does not involve the scope.[16] Instead, it involves whether Neel-Schaffer waived its right to seek punitive damages or, more specifically, the arbitrator's authority to award punitive damages.

¶37. The chancery court ruled that the punitive damage provision of the arbitration agreement was subject to two interpretations. The chancellor opined:

> It is not readily apparent from reading the arbitration provision what the drafter meant. One reading is that no punitive damages could be recovered. Another is only that the panel of arbitrators could not award punitive damages, but rather that the issue of punitive damages was to be left to the courts. This ambiguity is to be construed against the drafter. Therefore, the Court finds that the dispute in question, a claim for punitive damages, does not fall within the scope of that arbitration agreement. Having then found that the first prong of the test, whether the parties agreed to arbitrate the dispute in question, has not been satisfied, it is not necessary to reach the second prong.

¶38. Though the chancery court's opinion focuses on the issue of scope, its interpretations differ generally on whether the provision sets forth a complete or limited waiver of punitive damages. That is, whether Neel-Schaffer waived any right to seek punitive damages or whether such provision merely limited the arbitrators' authority to grant such damages and thereby allowing Neel-Schaffer whatever opportunity provided under the law to pursue punitive damages in court.

¶39. Gulf argues that the sentence in question is not ambiguous. Gulf contends that this sentence limits the remedies that potential arbitrators could award and that it does not limit the

---

[15]The first sentence states: "Any controversy arising out of or relating to this Policy or its breach shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association."

[16]This sentence states: The arbitration panel may make an award of Compensatory "**Loss**", but may not award punitive or exemplary "**Loss.**" (Emphasis in the original).

19

scope of the arbitration provision. Gulf agrees with the chancery court's first suggested interpretation in that the sentence prohibits the arbitration panel from awarding either party punitive damages. Gulf maintains that the scope of the arbitration provision is plainly set forth in the first sentence, which provides: "*Any controversy arising out of or relating to this Policy or its breach* shall be settled by binding arbitration in accordance with the rules of the American Arbitration Association." (emphasis added).

¶40.   Gulf notes that although the chancery court ruled that the provision was ambiguous regarding whether punitive damages fell within the scope, it declined to enforce the provision to the extent that there was no ambiguity. Gulf is confused as to why the chancery court declined to enforce the entire provision despite finding only that claims for punitive damage fall outside the scope.

¶41.   Neel-Schaffer maintains that the provision is ambiguous and that therefore chancery court correctly ruled that its claims against Gulf fell outside its scope. Neel-Schaffer likewise argues that there is a difference between "claim" and "loss" as defined under the policy and as referenced in the provision. The chancery court did not address this distinction nor did Neel-Schaffer raise such before it.

¶42.   Neel-Schaffer dismisses as semantic Gulf's argument that the limitation goes to remedy as opposed to scope. It argues that if the Court were to adopt Gulf's reasoning then it must also conclude that Neel-Schaffer waived its right to seek punitive damages. Neel-Schaffer strongly denies that it waived its right to seek punitive damages and contends that there is no proof that it intended to do so.

¶43. As to scope, the first sentence of the arbitration eliminates any doubt. The parties agreed that "[a]ny controversy arising out of or relating to this Policy or its breach," would be subject to binding arbitration. Neel-Schaffer does not argue that its claims do not arise out of or relate to the policy. Because of this and the fact that there is no ambiguity as to scope, Neel-Schaffer's claims unquestionably fall within the scope of the arbitration agreement.

¶44. In finding that the punitive damage provision was ambiguous, the chancellor relied on the doctrine of *contra proferentem* – where a contract is ambiguous it will be construed against the drafter. Gulf argues that the chancery court relied on the doctrine of *contra proferentem* to supplant the federal policy to construe ambiguities concerning the scope of arbitrability in favor of arbitration. *See Mastrobuouno v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62, 115 S.Ct. 1212, 131 L.Ed. 2d 76 (1995). The FAA "is a congressional declaration of a liberal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

¶45. Based on clearly established federal law and our case law addressing arbitration issues, there is no doubt here that in those instances where this Court must interpret *arbitration provisions*, the doctrine of *contra proferentem* must succumb to the federal policy. The federal policy, as an interpretive guideline, specifically concerns arbitration agreements, while on the other hand the doctrine of *contra proferentem* is a general rule of contract construction. The instant dispute (regarding the interpretation of the provision) is the type dispute that the FAA policy sought to eliminate.

¶46.　Neel-Schaffer contends that a remedial limitation necessarily limits the scope of arbitration. In support of this, Neel-Schaffer relies on *Mulder v. Donaldson, Lufkin, & Jenerette*, 623 N.Y.S.2d. 560 (N.Y. App. Div. 1995) for the proposition that where an arbitrator lacks authority to award punitive damages, a party may pursue a court action for punitive damages despite the fact that they already had been awarded compensatory damages in arbitration.[17] However, the scenario advanced by Neel-Schaffer would create a system where a party seeking punitive damages would prosecute an action in two different forums, and thus nullifying the effort under the FAA to reduce litigation costs.

¶47.　In sum, we conclude that there is no ambiguity in the provisions of the arbitration agreement. In the case sub judice, two companies and its employees/officers, sophisticated in business affairs, agreed to submit any dispute arising out of or related to the policy to a non-judicial forum. In doing so, the parties agreed that this forum would be without authority to render an award for punitive damages. It was likewise agreed that the ultimate resolution from the arbitrators would be final and binding. The argument that Neel-Schaffer's claims fall outside the scope of the arbitration agreement thus allowing Neel-Schaffer to seek punitive damages in a separate court proceeding is without merit. We thus find that the parties' dispute in today's case was within the scope of the arbitration agreement.

---

[17]Under New York law, the power to award punitive damages is limited to judicial tribunals and may not be exercised by arbitrators. *Garrity v. Lyle Stuart, Inc.*, 353 N.E.2d 793 (N.Y. 1976). *See also Mastrobuono*, 514 U.S. 52 (1995); *Belco Petroleum Corp. v. AIG Oil Rig, Inc.*, 565 N.Y.S.2d 776 (N.Y. App. Div. 1991).

¶48.   Having thus found that there was a valid arbitration agreement and that the parties' dispute fell within the scope of the arbitration agreement, we find that the parties in today's case agreed to arbitrate the dispute in question.

## II.   WHETHER LEGAL CONSTRAINTS EXTERNAL TO THE PARTIES' AGREEMENT FORECLOSE THE ARBITRATION OF THOSE CLAIMS.

¶49.   While the parties do not address this issue, we are compelled to at least briefly do so since this is the second prong in the required two-prong test in determining the validity of a motion to compel arbitration under the FAA. *East Ford*, 826 So.2d at 713. This issue was addressed by the United States Supreme Court in *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). The Court stated:

> That is not to say that all controversies implicating statutory rights are suitable for arbitration. There is no reason to distort the process of contract interpretation, however, in order to ferret out the inappropriate. Just as it is the congressional policy manifested in the Federal Arbitration Act that requires courts liberally to construe the scope of the arbitration agreements covered by the Act, it is the congressional intention expressed in some other statute on which the courts must rely to identify any category of claims as to which agreements to arbitrate will be held unenforceable. (Citations omitted).
>
> ******
>
> In sum, the Court of Appeals correctly conducted a two-step inquiry, first determining whether the parties' agreement to arbitrate reached the [issues].........and then, upon finding that it did, considering whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims. We endorse its rejection of Soler's [contentions].

473 U.S. at 627-28, 105 S.Ct. at 3354-55.

¶50. Succinctly stated, a meticulous review of the record, and our discussion thus far, clearly reveal that there is absolutely no existing legal constraint external to the parties' arbitration agreement which would out of necessity foreclose the arbitration of those claims.

## CONCLUSION

¶51. For the foregoing reasons, we find (1) that inasmuch as there was a valid arbitration agreement and the parties' dispute was within the scope of the arbitration agreement, Gulf and Neel-Schaffer agreed to arbitrate the dispute in issue; and (2) that there were no legal constraints external to the parties' agreement which would foreclose the arbitration of those claims. Having so found, we thus conclude that the learned chancellor erred in denying Gulf's motion to compel arbitration under the Federal Arbitration Act and in granting Neel-Schaffer's motion for preliminary injunction enjoining arbitration proceedings. We therefore reverse the chancery court's judgment denying Gulf's motion to compel arbitration and granting Neel-Schaffer's motion for preliminary injunction enjoining arbitration proceedings as set forth in the May 23, 2003, Order and Opinion, and remand this case to the Chancery Court of the First Judicial District of Hinds County for action consistent with this opinion, including dismissal of Neel-Schaffer's complaint and referring this case to arbitration.

¶52. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND DICKINSON, JJ., CONCUR. RANDOLPH, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**