# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2020-SA-01332-SCT

*WILKINSON COUNTY SENIOR CARE, LLC*

*v.*

*MISSISSIPPI DIVISION OF MEDICAID AND
DREW SNYDER, IN HIS OFFICIAL CAPACITY
AS EXECUTIVE DIRECTOR OF THE
MISSISSIPPI DIVISION OF MEDICAID*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/03/2020 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| TRIAL COURT ATTORNEYS: | JULIE BOWMAN MITCHELL |
| | PHILIP JOSEPH CHAPMAN |
| | ELLEN PATTON ROBB |
| | RANDALL ELLIOTT DAY, III |
| | DION JEFFERY SHANLEY |
| | JANET McMURTRAY |
| | SAMUEL PHILIP GOFF |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | JULIE BOWMAN MITCHELL |
| | PHILIP JOSEPH CHAPMAN |
| ATTORNEYS FOR APPELLEES: | JANET McMURTRAY |
| | MAUREEN BURKE SPEYERER |
| | SAMUEL PHILIP GOFF |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 06/30/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KING, P.J., CHAMBERLIN AND ISHEE, JJ.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1. After Wilkinson County Senior Care changed ownership, it received the maximum per diem rate from the Mississippi Division of Medicaid (DOM) for a period of twenty months. The DOM notified Wilkinson County Senior Care multiple times that the maximum per diem rate it received during this time period was subject to adjustment based on its initial cost report. The DOM did not seek recoupment of the overpayment based on the adjustment until 2011. Wilkinson County Senior Care argues that this delay forecloses the DOM from recouping the overpayment it received. The DOM and the chancery court both affirmed that the recoupment was allowable. Because no legal or equitable principles provide that the delay in this case forecloses recoupment, this Court affirms the decisions of the chancery court and the DOM.

**FACTS AND PROCEDURAL HISTORY**

¶2. On May 1, 2002, Wilkinson County Nursing Center, now known as Wilkinson County Senior Care, LLC (collectively, "Wilkinson"), had a change of ownership (CHOW). When a nursing facility undergoes a CHOW, it must "file a cost report from the date of the change of ownership through the end of the third month of ownership." Medicaid State Plan 4.19-D(M). This is generally referred to as the CHOW cost report. The DOM pays a facility that has changed ownership the maximum per diem rate "until the rate is adjusted based on this initial cost report." *Id.* The per diem rate ultimately calculated based on the CHOW cost report is retroactive to the CHOW date. *Id.* ("The rate computed based on the initial cost report of the new owner will be effective the same date the change of ownership was effective."). Additionally, the DOM's Provider Policy Manual at the time provided that new

2

facilities would "be paid the maximum established class rate[]" "[p]ending receipt of a cost report." DOM Provider Policy Manual 5.05. It further stated that, upon receipt of the CHOW cost report, "a per diem rate will be established based on a desk review and will be effective retroactively to the first day of certification." *Id.*

¶3. The DOM sent Wilkinson an enrollment letter that informed Wilkinson that it had been approved as a Medicaid provider effective May 1, 2002. The enrollment letter informed Wilkinson that "the rate for the new provider number has been calculated based on the maximum rate." The enrollment letter also informed Wilkinson that its CHOW cost report would be required for the period of May 1, 2002 through July 31, 2002, and would be due on December 31, 2002. The enrollment letter specifically informed Wilkinson that "[t]he rates will be adjusted retroactively to May 1, 2002 based on the initial cost report filed for this facility." In a January 31, 2003 letter, the DOM informed Wilkinson of its per diem rate for the period of January 1, 2003 through March 31, 2003. The letter noted that "[t]he rate will be adjusted based on a cost report submitted by your facility."

¶4. In a January 28, 2004 letter, the DOM informed Wilkinson that it had reviewed Wilkinson's CHOW cost report for the period of May 1, 2002 through July 31, 2002. It sent the letter to Wilkinson's then accountant, David Stewart. It made downward adjustments to some of Wilkinson's reported costs. Thus, the costs that ultimately would be used to calculate the per diem would be less than what Wilkinson reported in the CHOW cost report. The DOM does not calculate the per diem rate based on the adjusted cost report until the report is final—either after the time to appeal has run or after an appeal is complete.

3

Wilkinson did not appeal this decision regarding its CHOW cost report. Sometime in approximately 2008, Wilkinson changed accounting firms, retaining Horne. Stewart did not recall ever receiving the 2004 desk review.[1] Wilkinson claims that it and "its accountant" destroyed the desk review along with other records after five years.

¶5.     On October 11, 2011, the DOM sent Wilkinson a letter providing the per diem rate adjustments that had been made for the May 1, 2002 through December 31, 2003 time period based on Wilkinson's adjusted CHOW cost report. The total overpayment that the DOM attempted to recoup from Wilkinson was $701,856.53. The detailed cost analyses that the DOM attached to the 2011 letter reflected a printout date of August 9, 2005. Those analyses calculated the per diem rates for various time periods within the overall May 1, 2002 through December 31, 2003 time period, but did *not* calculate the total overpayment, i.e., they did not apply the per diem rate to the previously paid claims (the rate for each period multiplied by the number of beds and the number of days in each period, then subtracted from what was actually paid for each of those smaller time periods). Wilkinson appealed the October 11, 2011 recoupment letter.

¶6.     In 2002, the DOM changed fiscal agents. The new fiscal agent had software incompatibilities with the software used by the previous fiscal agent, which resulted in the DOM having issues handling claims and, particularly, with retroactively adjusting claims. ("The system was incapable of" retroactively adjusting claims based on new rates.). Then, due to new federal regulations, another new system for claims had to be created by October

---

[1]The DOM produced a United States Mail return receipt for the desk review signed by Wilkinson's accountant's office on January 29, 2004.

2003. During this time, the DOM established monthly meetings for providers so that the DOM could communicate the problems, issues, and delays it was experiencing with its systems to the providers. Bruce Kelly, one of Wilkinson's co-owners, participated in at least some of these meetings, as did an accountant for Wilkinson, Shane Hariel.[2] Hariel testified that rate adjustments were a recurring item during the meetings. Hariel stated that delays in rate adjustments were discussed in general terms, without specific facilities being mentioned. Hariel did state that, based on the 2004 desk review, an accountant for Wilkinson would have been able to calculate the rate and recoupment amount.

¶7. In appealing the October 11, 2011 recoupment attempt, Wilkinson argued that the DOM failed to offer sufficient support for the computations, and made various arguments that the recoupment violated record retention standards.[3] A hearing was held on September 12, 2012. The hearing officer found that no statutory or regulatory provisions required the DOM to issue rate adjustments within any set period of time and that Wilkinson knew it was subject to a rate adjustment. The hearing officer found that equitable estoppel did not apply and that the delay did not violate due process. The hearing officer therefore upheld the DOM's recoupment action. However, the hearing officer ordered the DOM to provide

---

[2]Hariel, who worked for Horne, began working for Wilkinson in 2008.

[3]On July 25, 2012, Wilkinson also requested an appeal of the 2004 desk review, alleging it first received notice of the review during the recoupment appeal. That appeal was denied as out of time, and the DOM produced a United States Mail return receipt for the desk review signed by Wilkinson's accountant's office on January 29, 2004.

5

Wilkinson with the data the DOM had used to calculate Wilkinson's patient days.[4] On April 17, 2013, the DOM's executive director adopted the hearing officer's findings and recommendations. The letter adopting the findings provided Wilkinson with the data the DOM had used to determine Wilkinson's patient days and provided Wilkinson fourteen days to challenge the final calculation based on that data.[5] Wilkinson appealed the DOM's decision to the chancery court on May 16, 2013. On July 25, 2013, Wilkinson and the DOM entered an agreed order to stay the proceedings pending this Court's determination regarding a jurisdictional issue in a separate case. In September 2019, the parties entered into a scheduling order and the appeal resumed in chancery court.

¶8. The chancery court entered its opinion and order affirming the DOM's decision on November 3, 2020. While the court expressed sympathy for "Wilkinson's frustration and indignation[,]" it found no statutory or regulatory provision establishing a statute of limitations on recoupment actions by the DOM. It further found that Wilkinson received due process and that equitable estoppel did not apply because Wilkinson knew it was subject to a final adjustment.

¶9. Wilkinson appeals to this Court. It argues that 1) recoupment should be equitably estopped due to the doctrine of estoppel by silence; 2) the decision was arbitrary and capricious, clearly erroneous, and not supported by substantial evidence; and 3) the decision violated Wilkinson's substantive due process rights.

---

[4]The 2004 desk report that Wilkinson did not appeal gave the number of patient days from the period of May 1, 2002 to July 31, 2002.

[5]This data was not placed in the appellate record.

ANALYSIS

*1.    Standard of Review*

¶10.        In reviewing a chancellor's opinion regarding a DOM decision, this Court reviews the agency's order to determine whether it "1) was supported by substantial evidence, 2) was arbitrary or capricious, 3) was beyond the power of the agency to make, or 4) violated some statutory or constitutional right of the complaining party." ***Cent. Miss. Med. Ctr. v. Miss. Div. of Medicaid***, 294 So. 3d 1121, 1125 (Miss. 2020) (internal quotation mark omitted) (quoting ***Adams v. Miss. State Oil & Gas Bd.***, 139 So. 3d 58, 62 (Miss. 2014)). Acts are arbitrary or capricious when done without reason or judgment. ***Id.***

***Miss. Methodist Hosp. & Rehab. Ctr., Inc. v. Miss. Div. of Medicaid***, 319 So. 3d 1049, 1054 (Miss. 2021).  This Court reviews agency interpretations of statutes, rules, and regulations de novo.  ***Id.*** at 1054-55.

*2.    Estoppel*

¶11.    Wilkinson argues that the DOM is barred from recouping the money based on the doctrine of estoppel by silence.  It argues that the chancery court only addressed equitable estoppel and failed to address estoppel by silence.  The parties treat estoppel by silence as if it is a different type of estoppel than equitable estoppel.  Yet caselaw makes clear that what the parties call estoppel by silence is indeed equitable estoppel.  Caselaw simply provides additional elements, namely the duty and opportunity to speak, that a party must prove when it argues that equitable estoppel should apply by virtue of silence, rather than by virtue of an affirmative representation.

¶12.    The essential elements of equitable estoppel are conduct and acts, language or *silence*, amounting to a misrepresentation or concealment of material facts, with knowledge or imputed knowledge of such facts, with the intent that the representation or *silence* or concealment be relied upon, with the other party's

ignorance of the true facts, and reliance to his damage upon the representation or *silence*.

*Turner v. Terry*, 799 So. 2d 25, 37 (Miss. 2001) (emphasis added) (citation omitted).

It is true that one of the most usual applications of the doctrine of estoppel in pais arises where there has been a misrepresentation or concealment of material facts on the part of the person or company to be estopped. It has long been an established rule of equity (now adopted by courts of law) that where one by his acts or representations (or even by his silence when he ought to speak) intentionally or through culpable negligence induced another to believe that certain facts exist so that he acts on these facts to his hurt and prejudice, such person may invoke the doctrine of estoppel against one who induces or by his negligent acts causes, a person to act to his hurt on such facts. *Kelso v. Robinson*, 172 Miss. 828, 161 So. 135 (1935); *Clark v. Dorsett*, 157 Miss. 365, 128 So. 79 (1930); *Staton v. Bryant*, 55 Miss. 261, 272 (1877); 19 Am. Jur. *Estoppel* § 51, at 653; § 55, at 661 (1939).

The rule that one may be estopped by his silence, however, presupposes that one not only had the duty to speak out, but that he had an opportunity to do so, and in addition, that his failure to speak when the opportunity was presented, was either intentional or in negligent disregard of plain dictates of conscience and justice.

*Resolute Ins. Co. v. State*, 290 So. 2d 599, 602 (Miss. 1974).

¶13.   "Equitable estoppel requires (1) 'proof of a belief' and (2) 'reliance on some representation' [or silence] coupled with (3) 'a change of position as a result of the representation' [or silence] and (4) 'detriment or prejudice caused by the change of position.'" *Cent. Miss. Med. Ctr. v. Miss. Div. of Medicaid*, 294 So. 3d 1121, 1129 (Miss. 2020) (quoting *Gulf Ins. Co. v. Neel-Schaffer, Inc.*, 904 So. 2d 1036, 1048 (Miss. 2004)), *overruled on other grounds by Miss. Methodist Hosp. & Rehab. Ctr.*, 319 So. 3d 1049. Equitable estoppel further requires that the representation or silence be accomplished with intent or culpable negligence. *Resolute Ins. Co.*, 290 So. 2d at 602.  If silence is what is

relied on, the party must additionally show that the party remaining silent had a duty and opportunity to speak. *Id.*

¶14. The chancery court found that Wilkinson could not meet its burden to prove either belief or reliance. While the chancery court only mentioned a "representation" and not "silence," the lack of proof of belief or reliance remains. The chancery court noted that

> the State Plan and the Provider Policy Manual both explicitly stated that the per diem rate would be adjusted retroactively to the first day of the CHOW subsequent to a Desk Review. Wilkinson received the Desk Review and knew that the DOM would calculate a final reimbursement using the same.

Furthermore, Wilkinson's enrollment letter explicitly stated that the per diem rate would be adjusted retroactively to the first day of the CHOW. Wilkinson knew that a rate adjustment was forthcoming because the DOM communicated that fact to Wilkinson multiple times. Wilkinson knew that the DOM was experiencing delays in processing certain claims and adjustments because the DOM communicated that it was experiencing such delays to its providers, including Wilkinson. Wilkinson consequently knew that it had a pending rate adjustment while the DOM was experiencing delays.

> [Wilkinson] admitted that it knew the DOM would calculate a final reimbursement using the [CHOW]. This admission dispels any belief that [Wilkinson] could meet the first or second elements of estoppel. [Wilkinson] cannot claim that the DOM is estopped from acting under the dictates of the Plan, just as [Wilkinson] knew it would.

*Cent. Miss. Med. Ctr.*, 294 So. 3d at 1129. Further, a lapse of time does not insulate a party from the recoupment of funds that it knew were subject to adjustment. *Id.* at 1128. Wilkinson's claim of equitable estoppel by silence therefore fails.

**3.** **_Arbitrary & Capricious, Clearly Erroneous, Not Supported by Substantial Evidence_**

9

¶15. Wilkinson argues that the agency decision was arbitrary and capricious because Wilkinson was unable to verify the amounts with its own records or data. Wilkinson had destroyed its records after five years, the minimum length of time it was required by statute to retain its records. It argued that the DOM's failure to notify Wilkinson that it would have a downward rate adjustment was unjust, and that Wilkinson destroyed its records due to the DOM's failure to notify it. Wilkinson argues that it should not have to "assume" negative rate adjustments would be applied.

¶16. Wilkinson does not argue that the rate adjustment was without reason or judgment. Wilkinson had the cost reports, the adjustments, and the methodology used to calculate the adjusted rate. Wilkinson does not allege that any of this was done incorrectly. The only information that Wilkinson cannot independently verify is the patient days. The DOM supplied Wilkinson with the data it used and generated to determine Wilkinson's patient days. Presumably, such data originated from Wilkinson's own data originally submitted to obtain the maximum per diem rate. Wilkinson does not allege that this data is incorrect, or even that it appears skewed or wrong. Wilkinson knows the number of beds it has and the average number that are full and could at least estimate patient days to determine if the DOM's calculations appeared substantially different from the norm. But Wilkinson merely alleges that the decision is arbitrary and capricious because it is unable to *independently* verify the number of patient days with its own records, without any allegation that the DOM's data was incorrect or even had the appearance of being incorrect.

¶17. Medicaid providers are required to maintain records for five years. Miss. Code Ann. § 43-13-118 (Rev. 2021). This statute "sets minimum requirements for document retention." *Cent. Miss. Med. Ctr.*, 294 So. 3d at 1128. Wilkinson knew the funds it received from May 1, 2002 through December 31, 2003 were subject to adjustment. It was not required to destroy its records from this time period, but it opted to. And again, a lapse of time does not insulate a party from the recoupment of funds that it knew were subject to adjustment. *Id.* at 1128. Wilkinson and its accountants could have flagged the forthcoming rate adjustment that the DOM affirmatively notified them was forthcoming. While Wilkinson's frustrations regarding the DOM's delays are understandable, it knew it had a pending outstanding rate adjustment and could have retained the documents regarding that rate adjustment. Wilkinson offers no evidence that the DOM's decision was arbitrary and capricious, clearly erroneous, or unsupported by substantial evidence.

**4.      Due Process**

¶18. Wilkinson claims that the DOM's lengthy delay in seeking recoupment and its lack of time limits in general during which to seek recoupment violate Wilkinson's substantive due process rights. It does not make a claim regarding procedural due process.

> Substantive due process prohibits infringement of fundamental liberty interest unless it is narrowly tailored to serve a compelling state purpose. *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993). A fundamental right is a right either explicitly or implicitly guaranteed by the constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–34, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973).

*Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 984 (Miss. 2004). Thus, to establish a substantive due process violation, a party must demonstrate a legally cognizable property

interest in an interest entitled to protection under the constitution. *Id.*; *Cent. Miss. Med. Ctr.*, 294 So. 3d at 1129. "If the right infringed upon is not fundamental, yet a substantive due process challenge is lodged, the statute (or rule) will be upheld so long as it is reasonably related to a legitimate state purpose." *Harris*, 873 So. 2d at 984 (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 124–25, 98 S. Ct. 2207, 2213, 57 L. Ed. 2d 91 (1978)).

¶19.    "Federal due process interests in property arise only from an independent source, such as state law statutory guarantees." *Westbrook v. City of Jackson*, 665 So. 2d 833, 838 (Miss. 1995). Wilkinson has a property interest in the provisional money it received from the DOM "to the extent that it earned the money." *Cent. Miss. Med. Ctr.*, 294 So. 3d at 1129. But as to the overpaid amount, the DOM's claim is superior, because "Mississippi law gave the DOM the right and the duty to demand return of the overpayment from [Wilkinson]." *Id.* Wilkinson does not explain how or why it has a legally cognizable property interest in overpayments that it did not earn. Nor does it explain how or why it has a legally cognizable property interest in avoiding an adjustment that it knew was forthcoming. This argument is consequently without merit. Wilkinson does not make a procedural due process argument; thus, this Court is not required to address whether the delay violated procedural due process.

## CONCLUSION

¶20.    Equitable estoppel does not apply because Wilkinson was on notice that an adjustment to the payments it received would occur. Wilkinson has not demonstrated that the DOM's decision was arbitrary and capricious. And Wilkinson has not demonstrated that its

12

substantive due process rights were violated.  This Court consequently affirms the decisions of the chancery court and the DOM.

¶21.   **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**