# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-SA-01410-SCT

*CENTRAL MISSISSIPPI MEDICAL CENTER*

*v.*

*MISSISSIPPI DIVISION OF MEDICAID AND
DREW L. SNYDER, IN HIS OFFICIAL CAPACITY
AS EXECUTIVE DIRECTOR OF MISSISSIPPI
DIVISION OF MEDICAID*


| | |
|---|---|
| DATE OF JUDGMENT: | 09/20/2018 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| TRIAL COURT ATTORNEYS: | GEORGE H. RITTER |
| | REBECCA L. HAWKINS |
| | BRIDGET K. HARRIS |
| | ABBIE EASON KOONCE |
| | PAIGE HENDERSON BIGLANE |
| | DION JEFFERY SHANLEY |
| | LAURA L. GIBBES |
| | JANET McMURTRAY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | GEORGE H. RITTER |
| | REBECCA L. HAWKINS |
| ATTORNEYS FOR APPELLEES: | JANET McMURTRAY |
| | SAMUEL PHILIP GOFF |
| | LAURA L. GIBBES |
| | DION JEFFERY SHANLEY |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 02/13/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1. Central Mississippi Medical Center (CMMC) appeals the Hinds County Chancery Court's decision denying its appeal of a Division of Medicaid (DOM) hearing. The DOM had determined that CMMC owed it $1.226 million due to overpayment. This Court recently decided a reimbursement dispute involving the DOM. *See Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid*, 240 So. 3d 385 (Miss. 2018). In *Crossgates*, the hospitals prevailed because the DOM had failed to adhere to the Medicare State Plan Agreement. Applying the same legal principles today, the DOM prevails because the DOM adhered to the Plan. The chancellor found sufficient evidence to support the DOM's decision, decreed that it was neither arbitrary nor capricious, and decreed that it did not exceed the DOM's authority or violate any of CMMC's statutory or constitutional rights. We affirm the decision of the chancery court.

**FACTS AND PROCEDURAL HISTORY**

¶2. Federal appropriations for Medicaid are available to states that negotiate a plan with the secretary of the federal Department of Health and Human Services. *See* 42 U.S.C. § 1396 (2012). After a plan is approved, the state Medicaid entity (in Mississippi, the DOM is the entity) is bound to follow the plan and cannot deviate from it. *See generally Crossgates River Oaks Hosp.*, 240 So. 3d 385 (holding that the DOM acted improperly by disregarding the plain language of the Plan). *See also Blanchard v. Forrest*, 71 F.3d 1163, 1166 (5th Cir. 1996). The Mississippi State Plan Agreement (Plan) requires the DOM to use the Medicare Notice of Program Reimbursement (NPR) to establish the final reimbursement. In fiscal year 2000, intermediate reimbursement was premised on projected expenses based on prior cost

reports the provider had submitted. Later, once final reports were obtained and the NPR generated, the DOM would issue notices to the providers, either requesting repayment of funds the provider had not earned or providing additional funds to address shortfalls.

¶3.     In April of 1999, CMMC purchased the former Methodist Healthcare-Jackson Hospital which consisted of a North Campus in northeast Jackson and a Main Campus in south Jackson. Later in 1999, CMMC lost a certification of need for its North Campus hospital. CMMC closed the North Campus on December 31, 1999. The closing was problematic for CMMC's reimbursements for fiscal year 2000 for Medicare and Medicaid.

¶4.     The North Campus was only in operation for eight of the months covered in fiscal year 2000, and all previous cost reports that the DOM could use to project costs had twelve months of costs included. Thus, the DOM requested that CMMC file an amended cost report to estimate costs taking into account the mid-fiscal-year closure. CMMC filed an amended cost report with the DOM that excluded both costs associated with the North Campus and the days in operation attributable to the North Campus. Based on this data, the DOM revised CMMC's reimbursement.

¶5.     In 2003, Mutual of Omaha, at the time a designated Medicare Intermediary, issued to CMMC its NPR. The NPR was based on final adjustments to CMMC's Medicare cost reports. In the absence of appeal by CMMC, it was the declaration of CMMC's final Medicare reimbursement for the period described.[1] CMMC acknowledged receipt of the NPR

---

[1]CMMC had the right to object within 180 days and to request a hearing if the dispute concerned between $1000 and $10,000. If it was less than that, the discrepancy could be remedied through clarification or additional documentation.

on September 23, 2003. The 180 days to amend the NPR formally or informally expired on March 22, 2004. Through no fault of the DOM or CMMC, the DOM did not receive its copy of the Medicare NPR until about seven years later. The delay was related to issues experienced by Mutual of Omaha and was compounded by other problems experienced by the DOM's claims processor, another third party, Affiliated Computer Services, Inc. The DOM notified CMMC early in 2004 of the delay in processing its claim.

¶6.     In compliance with the Plan, once the DOM received the Medicare NPR, the DOM accepted it to establish final reimbursement. After the DOM received the NPR, it adjusted CMMC's reimbursement based on data from the NPR and requested repayment of $1.226 million.  CMMC did not contest the accuracy of the NPR until October of 2010, more than seven years after CMMC received the NPR. CMMC claims as its reason not to appeal the NPR that the allegedly erroneous data in the NPR did not affect its Medicare reimbursement in a significant way. The DOM counters that if CMMC's characterization of the NPR data is correct, then CMMC's Medicare reimbursement was significantly inflated. The DOM argues that CMMC did not challenge the NPR before Medicare because correcting the data would have reduced its reimbursement. Regardless, CMMC knew the same data would be used by Medicare and the DOM.

¶7.     CMMC filed an administrative appeal before the DOM. A hearing officer was assigned to hear CMMC's appeal, found no merit to its appeal, and issued findings and conclusions. CMMC then appealed the decision of the hearing officer to the Hinds County Chancery Court. Again, CMMC failed to prevail. The Hinds County Chancery Court held

4

that the DOM's decision was supported by substantial evidence, was not arbitrary or capricious, and did not exceed the DOM's authority or violate CMMC's statutory or constitutional rights. CMMC appealed.

## STANDARD OF REVIEW

¶8.     In all cases in which we review a chancellor's opinion concerning a DOM  hearing officer's decision, we must decide "whether the order of the agency 1) was supported by substantial evidence, 2) was arbitrary or capricious, 3) was beyond the power of the agency to make, or 4) violated some statutory or constitutional right of the complaining party." *Adams v. Miss. State Oil & Gas Bd.*, 139 So. 3d 58, 62 (Miss. 2014) (internal quotation mark omitted) (quoting *Anadarko Petroleum Corp. v. State Oil & Gas Bd. of Miss.*, 99 So. 3d 109, 111 (Miss. 2012)).

¶9.     This Court has stated that arbitrary means "fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; [it is] not done according to reason or judgment . . . ." *Harrison Cty. Bd. of Supervisors v. Carlo Corp.*, 833 So. 2d 582, 583 (Miss. 2002) (quoting *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992)). We have also defined capricious to mean "freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of a disregard for the surrounding facts and settled controlling principles . . . ." *Id.*  (quoting *McGowan*, 604 So. 2d at 322).

¶10.    Further, "[a]n agency's interpretation of a rule governing the agency's operation is a matter of law that is reviewed de novo, but with great deference to the agency's

interpretation." ***Crossgates River Oaks Hosp.***, 240 So. 3d at 387 (citing ***Sierra Club v. Miss. Envtl. Quality Permit Bd.***, 943 So. 2d 673, 678 (Miss. 2006)). "Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law." ***Miss. State Tax Comm'n v. Miss.-Ala. State Fair***, 222 So. 2d 664, 665 (Miss. 1969). This deference is not to be confused with the lack of deference accorded to an agency in the interpretation of a statute, which is properly reserved to the courts of this State. ***King v. Miss. Military Dep't***, 245 So. 3d 404, 408 (Miss. 2018). The deference to the interpretation of a rule or regulation is obviated if the interpretation is clearly erroneous such that it is arbitrary, capricious, or an abuse of discretion. *See* ***Crossgates River Oaks Hosp.***, 240 So. 3d at 387 (citing ***Div. of Medicaid v. Miss. Indep. Pharmacies Ass'n***, 20 So. 3d 1236, 1238 (Miss. 2009)).

## ISSUES ON APPEAL

¶11.    On appeal the parties contest three central issues:

I.      Whether the DOM acted arbitrarily or capriciously by relying on the Medicare NPR to set CMMC's reimbursement rather than earlier submissions to the DOM by CMMC.

II.     Whether Mississippi Code Sections 43-13-117(J) and 43-13-118 restrict the DOM's authority to adjust CMMC's reimbursement because the adjustment was a "cut" that occurred after the statutory period to make it.

III.    Whether the DOM violated CMMC's due-process rights by adjusting CMMC's reimbursement.

## ANALYSIS

6

**I.      Did the DOM act arbitrarily or capriciously by relying on the Medicare NPR to set CMMC's reimbursement rather than earlier submissions to the DOM by CMMC?**

¶12.    CMMC first contends that the DOM acted arbitrarily by using the NPR to determine the final reimbursement rather than accepting submissions that CMMC provided in revised cost reports. CMMC unconvincingly argues that the Plan does not require the DOM to utilize the NPR and, without authority, argues that nothing prevents the DOM from amending the NPR. Both contentions are easily dispelled by the plain language of the Plan then in force. Attachment 4.19–A of the Plan, effective in fiscal year 2000, reads,

> The Division of Medicaid has entered into agreements with Medicare intermediaries for participation in a common audit program of Titles XVIII and XIX. Under this agreement, the intermediaries for participation in a common audit program shall provide DOM the results of the field audits of those hospitals located in Mississippi. DOM will prepare desk reviews based on those field audits. DOM will adjust the prospective rate paid to in-state hospitals based on these desk reviews and field audits.[2]

The DOM's interpretation of the Plan is sound. The clear and unambiguous language of Attachment 4.19–A of the Plan directs that the DOM shall use the same audits utilized by Medicare to establish the final reimbursement. *See Wicks v. Miss. Valley State Univ.*, 536 So. 2d 20, 23 (Miss. 1988) (stating that "will" is mandatory language akin to "shall" or "must"); *see also Pickering v. Hood*, 95 So. 3d 611, 619–20 (Miss. 2012) (stating that mandatory language forecloses alternative interpretations). The DOM utilized the NPR explicitly as directed by the Plan to adjust CMMC's prospective reimbursement to obtain a

---

[2] This was the operative Plan language from October 1, 1998, to October 1, 2005, which encompasses fiscal year 2000. *See Crossgates River Oaks Hosp.*, 240 So. 3d at 387 (applying then-effective plan document).

final reimbursement. CMMC argues that using the NPR when the NPR contained incorrect information makes the utilization arbitrary or capricious. The facts established do not support that argument.

¶13. Agencies act arbitrarily or capriciously when they fail to utilize facts and governing principles to render decisions. *Harrison Cty. Bd. of Supervisors*, 833 So. 2d at 583. The DOM utilized facts and governing principles to render its decision in this case. Here, the DOM precisely followed the Plan. It conducted a desk review based on the field audit and adjusted CMMC's reimbursement as the Plan dictated. There is no evidence that the DOM acted arbitrarily or capriciously by *relying* on the NPR which was specified by the Plan.

¶14. The DOM did not create the NPR; but CMMC participated in its creation by providing what it now claims to be inaccurate data. Additionally, CMMC had the opportunity to challenge the NPR as the letter attached to the NPR stated. CMMC acknowledged both receiving this letter and that it had 180 days to challenge the NPR. When it was in its best interest to accept the NPR, it chose not to challenge the NPR, despite knowledge the NPR contained inaccurate information. The Plan does not provide the DOM with the right to amend or modify the NPR, and federal regulations require Medicare, not the DOM, to generate it. *See* 42 C.F.R. § 405.1803 (2019), https://www.ecfr.gov/cgi-bin/text-idx?SID=12caaf3598a36c42d1fbd0276a0d30cc&mc=true&node=se42.2.405_11803&rgn=div8. It would be beyond the DOM's authority to unilaterally amend the NPR then.

¶15. Finally, CMMC concedes that it was aware that the DOM would use the NPR to process CMMC's final reimbursement. CMMC failed to timely avail itself of opportunities

8

for relief from Medicare. CMMC cannot now seek relief against the DOM for an alleged error in using the NPR or the errors of another entity in creating the NPR. CMMC accepted the benefits of the Medicare NPR reimbursement levels and then failed to exercise its right to correct the allegedly incorrect data, knowing that the DOM would use the NPR to generate reimbursement as well. CMMC acquiesced to the use of the NPR and took all the reimbursement it could garner from Medicare. Equitable principals defeat CMMC's complaints that the NPR is incorrect now. *E.g.*, **Twin States Realty Co. v. Kilpatrick**, 199 Miss. 545, 26 So. 2d 356, 358 (1946). As further discussed later in this opinion, these actions additionally bar any claim of equitable estoppel by CMMC.

II. **Do Mississippi Code Sections 43-13-117(J) and 43-13-118 restrict the DOM's power to adjust CMMC's reimbursement because the adjustment was a "cut" that occurred after the statutory period to make it?**

¶16. Next, CMMC cites two statutes, Mississippi Code Sections 43-13-117(J) and 43-13-118,[3] and argues that the DOM violated these statutes in revising CMMC's reimbursement. At the time of filing and of the reimbursement adjustment, 43-13-117(J) stated, "there shall be no cuts in inpatient and outpatient hospital payments, or allowable days or volumes, as long as the hospital assessment provided in Section 43–13–145 is in effect." Miss. Code Ann. § 43–13–117(J) (Supp. 2010).[4] Reading this section in a vacuum, CMMC argues that the

---

[3] CMMC cites the statutes effective at the time of the filing of the suit, Mississippi Code Section 43–13–117(J) (Supp. 2010) and Mississippi Code Section 43–13–118 (Rev. 2009).

[4] The Mississippi Legislature has since amended this provision to add, "[t]his subsection (J) shall not apply to decreases in payments that are a result of: reduced hospital admissions, audits or payments under the APR-DRG or APC models, or a managed care

9

DOM is restricted from reducing CMMC's payments in any manner. But, then-effective

43–13–117(D) overrides acceptance of such an argument. It reads,

> the restriction in this subsection *shall not prevent* the division from *changing*
> the payments, payment methodology . . . or rates of reimbursement . . . without
> an amendment to this section whenever those changes are required by federal
> law or regulation, or whenever those changes are necessary to correct
> administrative errors or omissions in calculating those payments or rates of
> reimbursement.

Miss. Code Ann. § 43–13–117(D) (Supp. 2010) (emphasis added).[5] This section clearly

empowers the DOM to change payments, payment methodologies, or rates of reimbursement.

That directly contradicts CMMC's argument that any adjustment is a cut. Additionally,

Section 43–13–121 explicitly empowers the DOM to "recover any and all payments

incorrectly made by the division to a recipient . . . ." Miss. Code Ann. § 43–13–121(1)(j)

(Rev. 2015). Thus, as provided by the Plan and authorized by statute, the DOM was

empowered to and under a duty to change prospective reimbursements into final

reimbursements.

¶17.    While Section 43–13–117(J) is silent on what constitutes a cut, reading the section in

light of the above sections provides context. *See 32 Pit Bulldogs v. Cty. of Prentiss*, 808 So.

2d 971, 974 (Miss. 2002) (stating that statutes should be read as a whole to provide context

to the meaning of individual sections).  If Section 43–13–117(J) was intended as a bar on the

---

program or similar model described in subsection (H) of this section." Miss. Code Ann. §
43–13–117(J) (Rev. 2015).

        [5] The Mississippi Legislature has since repealed subsection (D). *See* Miss. Code Ann.
§ 43–13–117(D) (Supp. 2019). *See also* Miss. Code Ann. § 43–13–117(K) (Supp. 2019)
("[t]his section shall be repealed on July 1, 2021.").

recovery of funds after a final reimbursement number is determined, then Section 43–13–117(J) would contradict the plain language of Sections 43–13–117(D), 43–13–121(1)(j), and the Plan, which directs the DOM to make final reimbursement calculations. Statutes may contradict themselves and each other, but when an interpretation harmonizes the various statutes, this Court will construe the statutes in that manner. *See Legislature of Miss. v. Shipman*, 170 So. 3d 1211, 1217 (Miss. 2015). Here, there is a readily discernable harmonization of the statutes. As such, this recovery of funds through adjusting prospective reimbursement into final reimbursement is not a "cut" within the meaning of Section 43–13–117(J) but an adjustment as directed by the Plan.

¶18.    CMMC's reliance on Section 43–13–118 is similarly ineffective. CMMC argues that the statute institutes a bar on recoupment cases more than five years after the initial disbursement of funds. But, Section 43–13–118 does not set forth a statute of limitations, rather it sets minimum requirements for document retention. Additionally, as CMMC conceded at oral argument, statutes of limitation do not run against the State. *Jones Cty. Sch. Dist. v. Miss. Dep't of Revenue*, 111 So. 3d 588, 606 (Miss. 2013) (citing Miss. Const. art. 4, § 104; Miss. Code Ann. § 15–1–51(Rev. 2012)). Section 43–13–118 provides, "[i]t shall be the duty of each provider . . . to keep and maintain . . . such books, documents, and other records . . . for a period of five (5) years or for whatever longer period may be required or prescribed under federal or state statutes and shall be subject to audit by the division." Miss. Code Ann. § 43–13–118 (Rev. 2015). The plain language of the statute controls, and there

is no mention of a statute of limitations. *See Camp v. Stokes*, 41 So. 3d 685, 686 (Miss. 2010).

¶19. CMMC also argues that through a lapse of time it had acquired a protected interest in funds it knew were subject to adjustment. CMMC was fully aware of the procedures the DOM followed for auditing and that it was yet to receive a final reimbursement statement from the DOM. The DOM maintained regular contact with CMMC and explained the difficulty the third-party processing agent was experiencing in rendering the final reports. The record indicates that CMMC was aware that the DOM would seek a final reimbursement and that the DOM would use the NPR, not older cost reports, to determine final reimbursement.

¶20. Finally, CMMC's claim of equitable estoppel is ineffective. Equitable estoppel requires (1) "proof of a belief" and (2) "reliance on some representation" coupled with (3) "a change of position as a result of the representation" and (4) "detriment or prejudice caused by the change of position." *Gulf Ins. Co. v. Neel-Schaffer, Inc.*, 904 So. 2d 1036, 1048 (Miss. 2004) (citing *Mound Bayou Sch. Dist. v. Cleveland Sch. Dist.*, 817 So. 2d 578, 583 (Miss. 2002)). As discussed above, CMMC admitted that it knew the DOM would calculate a final reimbursement using the NPR. This admission dispels any belief that CMMC could meet the first or second elements of estoppel. CMMC cannot claim that the DOM is estopped from acting under the dictates of the Plan, just as CMMC knew it would.

    **III.    Did the DOM violate CMMC's due-process rights by depriving CMMC of its fundamental rights in adjusting CMMC's reimbursement rates?**

¶21. Finally, the DOM did not violate CMMC's due-process rights. CMMC claims that it was deprived of both procedural and substantive due process. In order to prove a claim for procedural due process, a party must first demonstrate a property interest. *Nelson v. City of Horn Lake ex rel. Bd. of Aldermen*, 968 So. 2d 938, 944 (Miss. 2007) (citing *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528, 536 (Miss. 2000)). It is not enough to merely demonstrate a property interest though; the interest must be one entitled to protection under the Constitution. *Id.* (citing *Hughes*, 765 So. 2d at 536). If such a property interest is demonstrated, then the party is entitled to notice reasonably calculated to apprise the party of the action and an opportunity to be heard and to present objections. *Miss. Bd. of Veterinary Med. v. Geotes*, 770 So. 2d 940, 943 (Miss. 2000). Federal law determines whether a property interest is a constitutionally protected interest. *Nelson*, 968 So. 2d at 944 (citing *Hughes*, 765 So. 2d at 536). Under this standard, a property interest must be more than a unilateral expectation; it must be a legitimate claim of entitlement. *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 12 L. Ed. 702 (1972).

¶22. CMMC claims a property interest in the reimbursement money it provisionally received from the DOM. It has a legitimate claim to entitlement and due process to the extent that it earned the money. Due process was accorded initially by the DOM's grant of an administrative hearing. When CMMC's claim against the DOM was rejected, it appealed to the courts. When the chancery court rejected CMMC's claim, once again it was afforded another opportunity to appeal and be heard, now in this Court. Before all of these actions,

13

CMMC had an opportunity to appeal the NPR, which ultimately created the claim below. Its claim that it was denied procedural due process is therefore without merit.

¶23. The DOM's claim on the overpaid amount is superior to CMMC's claim. Just as a party can have superior claim to property against some while not possessing a superior title as to all, *c.f.* **Torrence v. Carbry**, 27 Miss. 697 (1854), CMMC may have a right to the money it received against all but the DOM. Mississippi law gave the DOM the right and the duty to demand return of the overpayment from CMMC.

## CONCLUSION

¶24. The plain language of Attachment 4.19–A of the Plan requires the DOM to revise reimbursement based on the NPR produced by Medicare. Our laws demand the action the DOM took. Consequently, the DOM's actions were neither arbitrary nor capricious, nor did the DOM exceed its authority or violate CMMC's constitutional rights. We affirm the judgment of the chancery court.

¶25. **AFFIRMED.**

**MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRIFFIS, J.; KITCHENS AND KING, P.JJ., JOIN IN PART. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶26. I agree with Chief Justice Randolph's majority opinion in all respects but one. Like Justice Coleman, I would end the practice of extending judicial deference to an executive

14

agency's interpretation of its rules and regulations. Therefore, I concur in part and in result with the majority opinion, and I join Justice Coleman's dissenting opinion in part.

**KING, P.J., JOINS THIS OPINION.**

**COLEMAN, JUSTICE, DISSENTING:**

¶27. The majority misses the mark on two points—the applicable standard of review for agency interpretation of regulations and the analysis and application of Mississippi Code Section 43-13-117. Accordingly, and with respect, I dissent.

**I.     The Court should no longer defer to executive agency interpretations of regulations.**

¶28. The majority supplies the inherently self-contradicting standard of review for agency interpretations of agency-promulgated regulations as follows:

> Further, "an agency's interpretation of a rule governing the agency's operation is a matter of law that is *reviewed de novo, but with great deference* to the agency's interpretation." ***Crossgates River Oaks Hosp.***, 240 So. 3d at 387 (citing ***Sierra Club v. Miss. Envtl. Quality Permit Bd.***, 943 So. 2d 673, 678 (Miss. 2006)). . . . The deference to the interpretation of a rule or regulation is obviated if the interpretation is clearly erroneous such that it is arbitrary, capricious, or an abuse of discretion. *See **Crossgates River Oaks Hosp.***, 240 So. 3d at 387 (citing ***Div. of Medicaid v. Miss. Indep. Pharmacies Ass'n***, 20 So. 3d 1236, 1238 (Miss. 2009)).

Maj. Op. ¶ 10 (emphasis added). In ***King v. Mississippi Military Department***, 245 So. 3d 404, 408 (¶ 12) (Miss. 2018), the unanimous court ended the practice of giving deference to state executive agencies' interpretations of statutes. The practice of the courts deferring to an executive-branch interpretation of agency regulations should likewise end.

¶29. As is the case with statutes, our *de-novo*-but-with-deference standard is confusing and vague. ***King***, 245 So. 3d at 407 (¶ 9). It defies consistency in result and in setting precedent

15

and therefore warrants review. Our description of the level of deference given has also lacked consistency. In *Tower Loan of Mississippi v. Mississippi State Tax Commission*, we adopted the federal standard of review:

> [a]n agency's interpretation of a regulation it has been authorized to promulgate is entitled to great deference and must be upheld unless it is so plainly erroneous or so inconsistent with either the underlying regulation . . . as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

*Tower Loan of Miss. v Miss. State Tax Comm'n*, 662 So. 2d 1077, 1081 (Miss. 1995) (internal quotation mark omitted) (quoting *Bd. of Trs. of State Insts. of Higher Learning v. Sullivan*, 763 F. Supp 178, 184 (S.D. Miss. 1991). The *Tower Loan* Court applied a far more deferential standard than the majority does today, showing that the Court has struggled over the decades with consistency when determining just how much judicial power should be given.

¶30.    Further highlighting the inherent self-contradiction of our attempts to afford deference is the standard enunciated in *Sierra Club v. Mississippi Environmental Quality Permit Board*, 943 So. 2d 673, 679 (¶ 17) (Miss. 2006), in which the Court wrote that "great deference" will be afforded—as long as the agency's interpretation does not contradict "the best reading" of a statute. Presumably, Mississippi courts always strive to discern the best reading of a statute, and if the best reading in a given case contradicts the agency interpretation, then deference disappears into the gloaming. So viewed, in reality, what sounds like deference becomes *de novo* review. The above-described *Sierra Club* iteration of the deference standard differs in unmistakable fashion from the great deference standard

16

of *Tower Loan*. In other words, inconsistency and self-contradiction mark the history of deference by courts to executive-branch agency regulatory interpretation.

¶31. As is the case with deference to agency interpretation of statutes, the standard for deference to agency interpretation of regulations cannot be squared with Mississippi's Constitution of 1890. Article 1, section 2, of the Mississippi Constitution provides as follows:

> No person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others. The acceptance of an office in either of said departments shall, of itself, and at once, vacate any and all offices held by the person so accepting in either of the other departments.

In ceding the rule-interpreting power of the courts to the executive branch by giving deference to agency interpretation of regulations, the Court in the past has put all or part of all three functions of government—rule making, rule enforcement, and rule interpretation—in the hands of one branch. *See Ellis-Hall Consultants v. Pub. Serv. Comm'n*, 379 P.3d 1270, 1275 (¶ 32) (Utah 2016).

¶32. "Nothing is more clear than that it is beyond the scope of legislative authority, to put a construction upon its laws which can be obligatory upon the courts. The province of the legislature is to enact laws, that of the court to expound or interpret them." *Planters' Bank v. Black*, 19 Miss. 43, 50-51 (1848). If interpretation of its own statutes lies outside the legislative bailiwick, then certainly an executive agency's interpretation of its own regulation runs afoul of article 1, section 2. "The ultimate authority and responsibility to interpret the law, including statutes, rests with this Court." *Queen City Nursing Ctr., Inc. v. Miss. State*

17

*Dep't of Health*, 80 So. 3d 73, 84 (¶ 28) (Miss. 2011); *see also **Miss. State and Sch. Emps.' Life and Health Plan v. KCC, Inc.***, 108 So. 3d 932, 939 (¶ 20) (Miss. 2013). Courts have the duty to determine what statutes provide. ***Lawson v. Honeywell Int'l, Inc.***, 75 So. 3d 1024, 1027 (¶ 7) (Miss. 2011). To paraphrase the ***King*** Court, executive-branch agencies should follow their regulations and, in the absence of a judicial holding, must decide the meaning of their regulations. However, when the interpretation of a regulation comes into a third-branch courtroom, the ceding of judicial authority to the executive branch violates article 1, section 2. ***King***, 245 So. 3d at 408 (¶ 11).

¶33. When it comes to pure questions of law, the Courts should not give deference to agency interpretations of regulations or statutes.

**II.     The Department of Medicaid violated Mississippi law by cutting Central Mississippi Medical Center's reimbursement.**

¶34. With respect, the majority undersells the language of Mississippi Code Section 43-13-117(J) (Rev. 2015). It provides, "*there shall be no cuts* in inpatient and outpatient hospital payments, or allowable days or volumes, as long as the hospital assessment provided in Section 43-13-145 is in effect." Miss. Code Ann. § 43-13-117(J) (emphasis added). One need not assume that the quoted language restricts reductions in Central Mississippi's payments—the language of the statute makes it crystal clear.

¶35. The majority points out that the term "cut" is undefined by the statute but that "words and phrases contained in a statute are to be given their common and ordinary meaning." ***Palermo v. LifeLink Found., Inc.***, 152 So. 3d 1099, 1105 (¶ 13) (Miss. 2014) (citing ***Lawson***, 75 So. 3d at 1027 (¶ 7)). The eighth of over eighty definitions of the word in

18

Webster's Unabridged Dictionary reads, "to lower, reduce, diminish, or curtail." *Cut*, Webster's Unabridged Dictionary (2d ed. 2001). However, one need not consult a dictionary to realize that, in demanding the disputed refund years later, the Department cut Central Mississippi's Fiscal Year 2001 inpatient payments.

¶36. The Division of Medicaid and the majority seek to work around the obvious violation of Section 43-13-117(J) by creating a conflict between it and other statutes, primarily Mississippi Code Section 43-13-117(D) (Rev. 2015). The supposed conflict, they argue, results in the conclusion that the word "cut" in Section 43-13-117(J) means something else. Maj. Op. ¶ 14. However, the grant of authority found in the then-existing subsection D to changing payments and payment methodologies applied only to the restriction against doing so found in subsection D itself. Moreover, there is no contradiction between the prohibition against cuts and the requirement that the Division of Medicaid make final reimbursement calculations. Certainly the Division may do so, but it must do so without making cuts. The majority does not harmonize the various statutes; it instead uses Section 43-13-117(D) and Section 43-13-121(1)(j) to erase subsection J's prohibition against cuts. What the majority in reality holds is that the Division's duty to set final reimbursement calculations trumps the prohibition—a conclusion that enforces one statutory provision at the cost of erasing another harmonizes nothing.

¶37. For its part, the Division of Medicaid also relies on its own interpretation of subsection J, contending that the prohibition against cuts only restricts changes in reimbursement methodologies. However, the plain language of the statute, which prohibits

19

cuts to "inpatient and outpatient hospital payments, or allowable days or volumes," quickly puts the Division's narrow interpretation to rest. Miss. Code Ann. § 43-13-117(J).

¶38. For the foregoing reasons, I would reverse.

**GRIFFIS, J., JOINS THIS OPINION. KITCHENS AND KING, P.JJ., JOIN THIS OPINION IN PART.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶39. This case requires the review of the interpretation of the Mississippi State Plan Agreement (the Plan) by the Division of Medicaid (DOM). The majority upholds the decision that the DOM was required to calculate the final Medicaid reimbursement rates of Central Mississippi Medical Center (CMMC) based solely on the Medicare Notice of Program Reimbursement (NPR). The majority also upholds the decision that the Plan does not allow the DOM to adjust or correct incorrect or erroneous data in the Medicare NPR to determine the appropriate Medicaid reimbursement rates.

¶40. A simple, plain reading of the governing provisions of the Plan establishes that the DOM's and the chancellor's interpretations are clearly erroneous, arbitrary, capricious, and an abuse of discretion. I would reverse the chancellor's ruling and remand this case for a hearing to consider the proper adjustment and to determine the appropriate reimbursement rates based on accurate data and information.

*I.    Introduction*

¶41. Although it is of no legal effect, it is interesting that we now consider the Medicaid reimbursement rates from almost twenty years ago. The majority, begrudgingly, concedes that this delay was not caused by CMMC. If it were, the statute of limitations would prevent

20

such consideration. Yet, because this unexplained delay was caused by any entity that performed functions on behalf of the DOM, we must now decide reimbursement rates from so long ago.

## II.    Standard of Review

¶42.    The majority states part of the applicable standard of review. "This Court has previously held [that] [m]atters of law will be reviewed de novo, with great deference afforded an administrative agency's construction of its own rules and regulations and the statutes under which it operates." *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 678 (Miss. 2006) (quoting *McDerment v. Miss. Real Estate Comm'n*, 748 So. 2d 114, 118 (Miss. 1999)). This "deference" is based on the "realization that the everyday experience of the administrative agency gives it familiarity with the particularities and nuances of the problems committed to its care which no court can hope to replicate." *Gill v. Miss. Dep't of Wildlife Conservation*, 574 So. 2d 586, 593 (Miss. 1990).

¶43.    But our review must also consider that if the DOM's interpretation is contrary to the unambiguous terms or best reading of a statute, no deference is due. *Sierra Club*, 943 So. 2d at 679. This Court has held that an agency's interpretation will not be upheld if "it is so plainly erroneous or so inconsistent with either the underlying regulation or statute as to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Buelow v. Glidewell*, 757 So. 2d 216, 219 (Miss. 2000) (internal quotation mark omitted) (quoting *Tower Loan of Miss., Inc. v. Miss. State Tax Comm'n*, 662 So. 2d 1077, 1081 (Miss. 1995)). Such is the case here.

III. *Whether the DOM was required to calculate CMMC's final Medicaid reimbursement rates based solely on the Medicare NPR.*

¶44. The majority's decision is based on the erroneous legal conclusion that the DOM was required to calculate CMMC's final Medicaid reimbursement rates based solely on the Medicare NPR. To support this conclusion, the DOM hearing officer, the chancellor and the majority cite one provision in the Plan—Attachment 4.19-A, Section IV, subsection B. In the years 2000 through 2001, subsection B stated,

> The Division of Medicaid has entered into agreements with Medicare intermediaries for participation in a common audit program of Titles XVIII and XIX. Under this agreement, *the intermediaries* for participation in a common audit program *shall provide DOM the results of the field audits* of those hospitals located in Mississippi. *DOM will prepare desk reviews based on those field audits. DOM will adjust the prospective rate paid to in-state hospitals based on these desk reviews and field audits*.

(Emphasis added.)

¶45. This provision clearly contemplates that there will be a review of the Medicare NPR, which is completely ignored by the majority. The intermediary was to perform an audit; this certainly indicates that it would undertake a review of the numbers submitted in the report, test the accuracy of the numbers and calculations, propose changes or adjustments in the report, and allow CMMC to respond or to offer further information to substantiate any numbers that were questioned before the final reimbursements were made. CMMC submitted the Medicare NPR based on Medicare's statutes, rules, and regulations. And the purpose of the Medicare NPR was to determine CMMC's Medicare reimbursement rates.

¶46. The majority concludes that CMMC had the right to challenge the Medicare NPR but did not. Thus, the majority concludes that because CMMC was obligated to challenge any

22

error as part of the Medicare review, it may not later challenge the numbers as applied to Medicaid reimbursement. The majority cites no authority for this conclusion. Further, as discussed later, the Plan clearly provides for the appeal for the use of incorrect data or an error in the rate calculation.

¶47. The majority offers no explanation as to how CMMC's reports to Medicare govern Medicaid reimbursements. CMMC certainly had the right to appeal the Medicare determination of its reimbursement rates. Such appeal would only affect CMMC's Medicare reimbursement rates. CMMC explained that the errors in the report were not material to and did not affect the Medicare reimbursement rates, so there was no reason or basis on which to appeal to Medicare. The majority cites no provision of federal law or Medicare regulations that would authorize an appeal of the Medicare NPR for the sole purpose of adjusting or correcting a later Medicaid review. Instead, the DOM and the majority blindly accept, and incorrectly rely on, the legal conclusion that CMMC had an obligation to appeal its Medicare NPR to Medicare in order to correctly determine Medicaid reimbursement rates. Such is not the case.

¶48. Subsection B of the Plan clearly indicates that the Medicare intermediary will provide results of their audits to the DOM. The DOM then reviews the audits and adjusts the prospective rate. Such language clearly indicates that Medicaid will consider the correction or adjustment of rates to correct any erroneous data.

23

¶49.    Interestingly, and not discussed by the majority, subsection B was amended before the reimbursement rates were calculated here.  In 2010, when this review occurred, Attachment 4.19-A, Section IV, subsection B, had been changed to read,

> The Division of Medicaid has entered into agreements with Medicare intermediaries for participation in a common audit program of Titles XVIII and XIX. Under this agreement, *the intermediaries* for participation in a common audit program *shall provide DOM the results of the field audits* of those hospitals located in Mississippi. *For years prior to the rate year beginning October 1, 2005, DOM will review these field audits and will adjust the prospective rate paid to in-state hospitals as appropriate. Only the original final settlement will be reviewed and adjustments made therefrom*.

(Emphasis added.)

¶50.    Thus, when Medicaid reviewed CMMC's Medicaid NPR audit from the intermediary in 2010, the Plan stated that the "DOM will review these field audits and *will adjust* the prospective rate paid to in-state hospitals *as appropriate*." (Emphasis added.) This provision contradicts the majority's conclusion that the "[t]he Plan does not provide the DOM with the right to amend or modify the NPR, and federal regulations require Medicare, not the DOM, to generate it." Maj. Op. ¶15.

¶51.    Subdivision B, as amended at the time of the DOM's review of CMMC's reimbursement rates applicable here, expressly stated that the DOM had the discretion and authority to accept, reject, or modify adjustments made in common audits "as appropriate." The majority's conclusion is simply not supported by subsection B as it existed at the time of the review.

> IV.    *Whether the Plan allows the DOM to adjust or correct incorrect or erroneous data in the Medicare NPR to determine the appropriate Medicaid reimbursement rates.*

24

¶52. The majority also concludes that the Plan does not allow the DOM to adjust or correct incorrect or erroneous data in the Medicare NPR to determine the appropriate Medicaid reimbursement rates. But the majority cites no authority for this proposition and does not address other relevant provisions in the Plan; yet, somehow, without consideration of the remaining relevant provisions of the Plan, the majority concludes that "the DOM's interpretation of the Plan is sound." Maj. Op. ¶ 13. I respectfully disagree and am concerned by the majority's disregard and omission of any discussion of these other relevant provisions in the Plan.

### A. Attachment 4.19-A, Section IV, Subsection G

¶53. The Plan, in Attachment 4.19-A, Section IV, subsection G, entitled "Request for Rate Change-For Rate Years Prior to October 1, 2005," reads,

> *A hospital may at times offer to the public new or expanded services*, purchase equipment, drop such services, or retire equipment *which requires Certificate of Need (CON) approval*. Within thirty (30) days of implementing a CON approved change, *the hospital must submit to the Division an allocation of the approved amount to the Medicaid Program*. This amount must be separated as applicable between capital costs, educational costs and operating costs. An estimate of any increase or decrease in operating costs applicable to the Medicaid Program due to the change, as well as the effective date of the change will also be submitted. *Such amounts will be subject to desk review and audit by the Division. Allowance for such changes shall be made to the hospital's Medicaid Prospective rate as provided elsewhere in this plan.* Failure to submit such required information within thirty (30) days will be a basis for disallowance of all expenses associated with the change. Overpayments as a result of the difference between estimates and actual costs shall be refunded to the Division of Medicaid.

(Emphasis added.)

25

¶54. At the hearing, CMMC offered evidence that the DOM had expressly agreed that, "in accordance with" this provision, the DOM required CMMC "to provide DOM with an Amended [Medicaid] Cost Report." The DOM further acknowledged that the "DOM accepted the Amended [Medicaid] Cost Report with this approach [exclusion of North Campus costs and patient days] for the estimate required by Section G." Despite this provision and this admission, the DOM now claims that it is bound by the Medicare NPR, which was a review of CMMC's Medicare—not Medicaid—cost report. This was contradicted by the DOM's concession that CMMC's prospective rate was in fact set based upon the amended Medicaid cost report as required by Section IV, subsection G, of Attachment 4.19-A.

¶55. In addition, subsection G does not require CMMC to appeal the Medicare NPR as a prerequisite to appeal an erroneous rate calculation by the DOM. Instead, subsection G establishes that the DOM is responsible for preparing the "estimate of any increase or decrease in operating costs applicable to the Medicaid Program due to the change," with "[s]uch amounts . . . subject to desk review and audit by the Division." This provision establishes that the DOM, not Medicare, is responsible for correctly setting CMMC's Medicaid reimbursement rate. Subsection G does not transfer this authority to the federal Medicare agency, CMS, or its intermediary.

### B. Attachment 4.19-A, Section IV

¶56. The DOM refers to the administrative hearing officer's report and recommendation, which was adopted in toto in the DOM's Lump Sum Settlement, to argue that subsection E

of Section IV "only appl[ies] when DOM discovers errors on the part of DOM or a provider concerning DOM's documents." This conclusion is clearly erroneous.

¶57.    The language relied upon by the hearing officer and the DOM is not in subsection E of Attachment 4.19-A, Section IV, which provides,

> Overpayments as a result of an error or misrepresentation will be reimbursable to Medicaid within sixty days of the date of the notification to the Provider of the amount due. Underpayments, likewise determined, will be reimbursable to the Provider.

¶58.    In fact, the location of subsection E on page 4 of Attachment 4.19-A-immediately following subsections B (Common Audit Program), C (Other Hospital Audits) and D (Retention), clearly indicates that subsection E (Overpayments/Underpayments) applies to both the common audit program and other hospital audits. As a result, subsection E's requirement for the DOM to reimburse providers for underpayments applies to both field audits under subsection B and other hospital audits under subsection C.   Nothing in subsection E limits the DOM's ability to correct errors that result in underpayments to hospitals.  Instead, it logically provides that "underpayments, likewise determined, will be reimbursable to the Provider."

¶59.    Also, both the DOM and the hearing officer took the position that subsection E "only appl[ies] when DOM discovers errors on the part of DOM or a provider concerning DOM's documents."   Subsection E does not support the conclusion that CMMC may not appeal the errors in issue here.  This is because the DOM's retro-rate calculation at issue is one of the "DOM's documents," and the errors appealed were errors "on the part of DOM."   The specific "DOM document" at issue is entitled "Central MS Medical Center Computation of

FY 2001 Rate" and was attached to the lump sum settlement. The "DOM error" at issue is the use of incorrect data in the retro-rate calculation. Thus, the errors appealed by CMMC were "on the part of DOM . . . concerning DOM's documents."

¶60. Finally, the DOM argues that "nothing in this provision authorizes DOM to audit or correct the NPR, which is prohibited by Section IV-B." This is simply wrong; there is no such prohibition. CMMC did not ask the DOM to change the Medicare NPR. The Medicare NPR, which is used to set Medicare rates, will remain unchanged. But, the data used in the Medicaid rate calculation will be corrected. There is no need to amend or change the Medicare NPR for the DOM to use correct data. The DOM only needs to insert the correct data into the Medicaid rate calculation. This correct data was provided to the DOM in 2001 in the Amended Medicaid Cost Report and again through undisputed testimony and documentary evidence at the administrative hearing.

### C. *Attachment 4.19-A, Section VI, Subsection K.1*

¶61. The DOM also relies on Section IV, subsection K.1, which reads,

> The prospectively determined individual hospital's rate may be adjusted under certain circumstances, which are:
>
> 1. Discovery of administrative errors on the part of [the DOM] or the facilities which may result in erroneous payments, as determined by [the DOM] . . . .

¶62. CMMC discovered mistakes made that resulted in erroneous payments. The phrase "as determined by [the DOM]" authorizes the DOM to correct these mistakes. This provision makes no sense if the DOM is bound by mistakes in the Medicare NPR.

28

¶63. Section IV, subsection K, does not extinguish a hospital's right to appeal errors made in those adjustments or errors in the calculation of the revised rate. It does not create an exception to the DOM's authority to correct mistakes merely because the incorrect data comes from the Medicare NPR. As discussed below, under Section VI of Attachment 4.19-A, if the hospital disagrees with that adjustment or with the calculation, it may file an appeal with the DOM. This is exactly what CMMC did and is clearly authorized by the Plan.

### D. Attachment 4.19-A, Section VI

¶64. The DOM's refusal to correct undisputed errors in its rate recalculation must also be viewed under Section VI of Attachment 4.19-A, which provides,

> Inpatient hospital providers who disagree with an adjustment to their allowable cost or a calculation in the rate setting information *may file an appeal* with [the DOM]. The following reasons would be grounds to file an appeal with the [the DOM, including]. . . *[i]ncorrect data were used or an error made in the rate calculation*.

(Emphasis added.)

¶65. Section VI of the Plan expressly authorized CMMC to appeal adjustments in its allowable costs or the calculation of its inpatient rate when "incorrect data [was] used or an error made in the rate calculation." This broad right of appeal contradicts the majority's conclusion that the DOM cannot correct errors used in its own rate calculations. If such is the case, the majority has erased from the Plan a hospital's right of appeal. Such cannot be the case.

¶66. For these reasons, I respectfully dissent. I am of the opinion that the decision of the DOM and the chancellor was clearly erroneous, arbitrary, and capricious. Further, the

decision of the DOM and the chancellor violated the clear language of the Plan. I would reverse the chancellor's judgment and remand this case with instructions for the chancellor to consider how the incorrect data affected CMMC's Medicaid reimbursement and to calculate the reimbursement rate using the correct data.

**COLEMAN, J., JOINS THIS OPINION.**